JUSTIN E. GRAY, CA Bar No. 282452
  jegray@foley.com
FOLEY & LARDNER LLP
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CALIFORNIA  92130
TELEPHONE:    858.847.6700
FACSIMILE:    858.792.6773

PAUL V. STORM (*Pro Hac Vice*)
  pvstorm@foley.com
TERRELL R. MILLER (*Pro Hac Vice*)
  tmiller@foley.com
J. MICHAEL THOMAS (*Pro Hac Vice*)
  jmthomas@foley.com
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 MCKINNEY AVENUE, SUITE 1600
DALLAS, TX 75201-3340
TELEPHONE:    214.999.3000
FACSIMILE:    214.999.4667

Attorneys for Defendant
ACE PARKING MANAGEMENT, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARK ASSIST LLC,<br><br>             Plaintiff,<br><br>      v.<br><br>SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY AND ACE PARKING MANAGEMENT, INC.,<br><br>             Defendants. | Case No. 3:18-cv-02068-BEN-MDD<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ACE PARKING MANAGEMENT, INC.'S MOTION FOR RULE 11 SANCTIONS**<br><br>Date:      April 22, 2019<br>Time:    10:30 a.m.<br>Place:    Courtroom 5A<br>Judge:    Hon. Roger T. Benitez |

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .................................................................................. 1

II.     FACTUAL BACKGROUND.................................................................. 2

III.    PROCEDURAL BACKGROUND .......................................................... 4

IV.     LEGAL STANDARD ............................................................................ 7

        A.      RULE 11 GENERALLY ............................................................ 7

        B.      RULE 11 IN THE PATENT INFRINGEMENT CONTEXT ................... 9

        C.      SANCTIONS PURSUANT TO RULE 11 ............................................ 11

V.      ARGUMENT........................................................................................ 12

        A.      PARK ASSIST VIOLATED ITS RULE 11 OBLIGATIONS
                REGARDING THE REQUIREMENT FOR HUMAN OVERRIDE. ...... 12

        B.      PARK ASSIST VIOLATED ITS RULE 11 OBLIGATIONS
                REGARDING THE REQUIREMENT FOR PARKING PERMIT
                ENFORCEMENT. .................................................................. 18

        C.      PARK ASSIST VIOLATED ITS RULE 11 OBLIGATIONS
                REGARDING CLAIM 1 OF THE '956 PATENT.................................. 23

        D.      PARK ASSIST IS PURSUING THIS LITIGATION IN BAD FAITH.... 24

VI.     CONCLUSION..................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
    498 U.S. 533 (1991).................................................................................... 8

*Christian v. Mattel, Inc.*,
    286 F.3d 1118 (9th Cir. 2002) ............................................................... 9, 18

*Cooter & Gell v. Hartmax Corp.*,
    496 U.S. 384 (1990).................................................................................... 8

*Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*,
    243 Fed. Appx. 603 (Fed. Cir. 2007).................................................... 23

*CyWee Grp., Ltd. v. LG Elecs., Inc.*,
    No. 3:17-cv-01102-BEN-RBB, 2018 U.S. Dist. LEXIS 100826
    (S.D. Cal. June 15, 2018) ........................................................................ 10

*Digeo, Inc. v. Audible, Inc.*,
    505 F.3d 1362 (Fed. Cir. 2007) .............................................................. 10

*Discflo Corp. v. Am. Process Equip., Inc.*,
    No. 11-CV-00476-BTM (RBB), 2011 U.S. Dist. LEXIS 149424,
    2011 WL 6888542 (S.D. Cal. Dec. 29, 2011) ....................................... 10

*Frazier v. Wireline Sols., LLC*,
    725 F. Supp. 2d 588 (S.D. Tex. 2010)..................................................... 24

*Gaskell v. Weir*,
    10 F.3d 626 (9th Cir. 1993) ..................................................................... 12

*Intamin, Ltd. v. Magnetar Techs., Corp.*,
    483 F.3d 1328 (Fed. Cir. 2007) ................................................................ 9

*Jenkins v. Methodist Hosps. of Dallas, Inc.*,
    478 F.3d 255 (Fed. Cir. 2007) ................................................................ 11

*Judin v. United States*,
    110 F.3d 780 (Fed. Cir. 1997) ................................................................ 25

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) .............................................................. 23

# TABLE OF AUTHORITIES
## (*Continued*)

**Page(s)**

**Cases (*Cont'd*)**

*Ormco Corp. v. Align Tech., Inc.*,
   463 F.3d 1299 (Fed. Cir. 2006) ................................................................. 23

*Phigenix, Inc. v. Genentech, Inc.*,
   No. 15-CV-01238-BLF, 2016 U.S. Dist. LEXIS 150752
   (N.D. Cal. Oct. 31, 2016)..................................................................... 11

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
   360 F.3d 1295 (Fed. Cir. 2004) ............................................................. 9, 10

*Raylon, LLC v. Complus Data Innovations, Inc.*,
   700 F.3d 1361 (Fed. Cir. 2012) ................................................................. 11

*Rhinehart v. Stauffer*,
   638 F.2d 1169 (9th Cir. 1979) ................................................................. 11

*Segan LLC v. Zynga Inc.*,
   131 F. Supp. 3d 956 (N.D. Cal. 2015) ....................................................... 11

*Segan LLC v. Zynga Inc.*,
   No. 14-cv-01315-VC, slip op. (N.D. Cal. June 5, 2015).......................... 11

*Townsend v. Holman Consulting Corp.*,
   929 F.3d 1358 (9th Cir. 1990) (en banc) .................................................. 9

*Trs. of Boston Univ. v. Everlight Elecs. Co.*,
   896 F.3d 1357 (Fed. Cir. 2018) ................................................................. 24

*View Eng'g, Inc. v. Robotic Vision Sys.*,
   208 F.3d 981 (Fed. Cir. 2000) ........................................................... 9, 10, 11

*Zaldivar v. City of Los Angeles*,
   780 F.2d 823 (9th Cir. 1986) ................................................................... 9

**Other Authorities**

Federal Rules of Civil Procedure:
   Rule 11 ................................................................................. *passim*

# I.    INTRODUCTION

Park Assist LLC's ("Park Assist") Complaint and First Amended Complaint ("FAC") against Ace Parking Management, Inc. ("Ace Parking") and San Diego County Regional Airport Authority (the "San Diego Airport") are frivolous.  And it is not a close call.  The Complaint and FAC contain factually baseless allegations fundamental to Park Assist's claim.  From an objective perspective, Park Assist asserts things that simply do not exist.  Moreover, Park Assist's counsel failed to conduct – ***and could not have conducted*** – a reasonable and competent inquiry before signing the pleadings.  This motion is brought early in the case before the full expense of a patent infringement case has already been spent.  It is apparent, as shown herein, that there is no basis for the claim and there is no reason to delay the imposition of sanctions.[1]

The Complaint and FAC against Ace Parking allege infringement of Park Assist's U.S. Patent No. 9,594,956 ("the '956 patent").  Park Assist's claim rests on three fundamental false premises.  Specifically, Park Assist falsely alleges:

> 1) that the San Diego International Airport's Terminal 2 Parking Plaza (the "Airport Parking Plaza") uses human review and override of automatic determinations by the system – ***it does not***;
>
> 2) that the Airport Parking Plaza allocates areas for permit parking and punishes unauthorized parkers – ***it does not***; and
>
> 3) that the '956 patent does not simultaneously require a parking space that is vacant and occupied – ***it does***, which means that claim 1 describes a physical impossibility and is legally baseless.

If even one of these premises is false, Park Assist's claim must fail.  Park Assist's counsel knew or should have known that each of these allegations was false.  First,

---

[1] Ace Parking also expects the pending motion to dismiss to be granted.  Before an entry of judgment based on that motion, Ace Parking seeks an award of its attorneys' fees to date and seeks to avoid increasing that amount.

Counsel knew that no human override exists because Park Assist participated in the bid process and received the project specifications (reflected in the very documents Park Assist attached to the FAC). Second, Counsel knew that the Airport Parking Plaza had no areas controlled by permits because Park Assist went to the Airport Parking Plaza and saw that no permit parking exists (reflected in photographs taken by Park Assist). Finally, Counsel knew or should have known that the '956 patent could not be infringed because Counsel knew that a parking space cannot possibly be both vacant and occupied at the same time, as the patent requires. Park Assist's misconduct merits sanctions.

## II.  **FACTUAL BACKGROUND**

This lawsuit concerns camera-based parking guidance systems. These systems use digital cameras together with other sensors to monitor entrances, exits, and parking spaces to track cars entering, leaving, and parking in a parking facility. These systems make parking easier by informing drivers how many open parking spaces are available on a given parking level and guiding them to open spaces using colored lights (*e.g.* green) to indicate vacant parking spaces. Occupied parking spaces are indicated with their own color (*e.g.* red). These systems also inform the parking facility with real-time information on number and location of open spaces, parking patterns, duration of stays, management of parking fees, and information on entry, exit, and location of cars. To make this information useful, the monitoring occurs automatically in real-time. Typically, the information updates several times per minute for every parking space as changes occur. If the information is not updated quickly, the system could direct drivers to occupied parking spaces, causing frustration. Declaration of Michael DeGraffenreid in Support of Ace Parking Management, Inc.'s Motion for Rule 11 Sanctions ("DeGraffenreid Declaration"), ¶ 3.

One component of such systems involves determining that a parking space has become occupied, by continuously analyzing a digital image of that parking space. When a car pulls into a vacant space, the system analyzes the digital image to determine that the space has become occupied. Then the associated light turns red, the number of

available spaces on that level decreases by one, and the total number of cars parked in the facility increases by one. None of this is helpful unless it happens automatically and quickly. The basic camera processing technology used in such systems has been known for years and is gaining acceptance. INDECT USA Corp. ("INDECT")[2] and Park Assist[3] are two of the largest suppliers for such systems.

Park Assist's frivolous claim – that use of the Airport Parking Plaza infringes the '956 patent – is simply Park Assist's improper attempt to eliminate competition from INDECT in camera-based parking guidance systems. Park Assist has dragged the San Diego Airport and Ace Parking into this case to further that improper goal.

The United States Patent and Trademark Office ("USPTO") only granted Park Assist the '956 patent after Park Assist accepted two key limitations narrowing its patent claims. Park Assist agreed to limit its patent to methods that: (1) use human override of mistaken determinations of occupancy when a space is actually vacant; and (2) enforce parking permits when a space is occupied by an unauthorized vehicle. Declaration of Justin E. Gray in Support of Ace Parking Management, Inc.'s Motion for Rule 11 Sanctions ("Gray Decl.") Ex. A. The human override requirement includes display of parking spaces identified as occupied, followed by human review and human correction of the determinations made by the cameras when a mistake occurs. Manual review and correction allows a human to change guidance lights at each parking space to reflect the correct status. In other words, for the "human override" element to be met, the system must identify a vacant space as occupied and then allow a human to correct the mistake. Furthermore, the "permit enforcement" requirement includes scanning parked cars for a permit and initiating enforcement proceedings (*e.g.* towing, ticketing) if a car parks in an unauthorized area.

---

[2] The supplier of the camera-based parking guidance system used in the Airport Parking Plaza.

[3] The supplier who lost the bid to supply the Airport Parking Plaza with its own camera-based parking guidance system.

Frustrated that the USPTO denied Park Assist a patent on any use of cameras for parking, Park Assist proceeded with this lawsuit despite the fact that its knows (or would have known had it exercised reasonable diligence) that the Airport Parking Plaza has neither human override nor permit enforcement functionality.  Additionally, elements (h) and (i) of claim 1 in Park Assist's patent require a physical impossibility (that a parking space be both occupied and vacant at the same time), and afford no legal basis for Park Assist's claim.  For these reasons Park Assist's claim is completely frivolous.  This Court should not countenance the filing of a complaint premised on two factually baseless allegations and one legally baseless allegation, especially when the most basic of pre-filing investigations would have confirmed that no human override exists and no permit enforcement exists.

## III.   **PROCEDURAL BACKGROUND**

On September 5, 2018, Park Assist filed this lawsuit against the San Diego Airport and Ace Parking based on their operation of the Airport Parking Plaza, claiming that use of the Airport Parking Plaza infringes claim 1 of the '956 patent.  D.I. 1.  The Complaint did not provide any detail as to Park Assist's infringement allegations.  *See generally id.* ¶¶ 13-25.

On October 17, 2018, Eric Acker, on behalf of the San Diego Airport, wrote Park Assist's counsel raising Rule 11 concerns.  Mr. Acker's letter raised essentially the same issues raised in this motion: (1) that the Airport Parking Plaza has no human override, (2) that the Airport Parking Plaza has no permit enforcement, and (3) that neither the San Diego Airport nor any other identified party could directly infringe the '956 patent.  Gray Decl. Ex. B.  INDECT also filed a Complaint in this Court seeking declaratory relief that its camera-based parking guidance systems do not infringe Park Assist's '956 patent.  Gray Decl. Ex. C.

Undeterred by Rule 11 or any concern for the truth, on October 22, 2018, counsel for Park Assist responded.  Gray Decl. Ex. D.  The response was apparently a "cut and paste" from the draft FAC that Park Assist filed four days later.

On October 26, 2018, Park Assist filed the FAC.  D.I. 23.  The FAC provided some detail as to Park Assist's infringement allegations.  *See generally id.* ¶¶ 45(a)-(k).  But, the additional detail itself confirms the frivolous nature of Park Assist's claim.  For the human override requirement, Park Assist pointed to language in an RFP by the San Diego Airport (which Park Assist refers to as the "PGSR" in the FAC), as well as an INDECT brochure, data sheet, and website generally describing the flexible capabilities of INDECT's camera-based parking guidance system.  *Id.* ¶¶ 45(h)-(i).  Not one of these documents says that the Airport Parking Plaza has human override of occupancy determinations when an error occurs.  For the permit enforcement requirement, Park Assist relies on unrelated language in the PGSR relating to preferred parking spaces and language from an INDECT data sheet regarding the ability to read license plate numbers.  *Id.* ¶¶ 45(j)-(k).  It is a red flag that Park Assist does not point to any evidence – or even an allegation – that the Airport Parking Plaza has areas requiring a permit.  Park Assist's documents, at most, indicate that the Airport Parking Plaza could charge different rates for different categories of users.  But differential parking rates do not require a permit and no permit enforcement is involved.

The '956 patent contains a single independent claim with a number of specific elements.  These elements fall into three groups.  The first group of elements (elements (a) through (e)) relates to camera-based parking guidance.  These elements were well known in the prior art as the USPTO informed Park Assist multiple times during prosecution of the '956 patent.  Gray Decl. Ex. E.  The second group of elements (elements (f) through (h)) relates to the human override requirement.  The third group of elements (elements (i) and (j)) relates to the permit enforcement requirement.

Claim 1 of the '956 patent in its entirety states:

> A method of managing a plurality of parking spaces, comprising:
>
> ***[Camera-based parking guidance]***
>
> (a) monitoring a parking space with an imaging device of an imaging unit;

(b) detecting, by said imaging unit, occupancy of said parking space;

(c) assigning said parking space, in which said occupancy was detected, an occupied status, wherein said occupied status is indicated by illuminating a first color of a multicolor indicator collocated with said imaging device, said first color predefined to determine said occupied status;

(d) obtaining, as a result of said parking space having said occupied status, a single high resolution image of a vehicle occupying said parking space, said high resolution image obtained by said imaging device;

(e) storing at least part of said high resolution image on a storage device;

*[Human review and override of erroneous occupancy determinations]*

(f) displaying a thumbnail image of said parking space on a graphic user interface (GUI), said thumbnail image digitally processed from an image electronically communicated to said GUI from said imaging unit;

(g) deciding whether said occupied status is incorrect, based on a visual review of said thumbnail image on said GUI;

(h) correcting said occupied status, by inputting computer-readable instructions to a computer terminal of said GUI, if said parking space shown in said thumbnail image is vacant and said computer terminal electronically communicating a command to toggle said multicolor indicator to illuminate a second color, said second color predefined to indicate a vacant status;

*[Parking permit detection and enforcement]*

(i) extracting from said high resolution image, by digital image processing, a permit identifier for said vehicle and comparing said permit identifier with at least one parking permit identification stored on said storage to determine a permit status of said parked vehicle; and

(j) initiating an infringement process for said vehicle having said permit identifier that fails to coincide with at least one of said at least one parking permit identification.

D.I. 23-1 at 22:31-23:4 (headings and emphasis added).

Human review and override involves constantly monitoring the determinations of the system and making a correction when the system identifies a vacant spot as occupied.  It requires the following steps: (1) identifying a parking space as being occupied; (2) displaying an image of the parking space that is allegedly occupied; (3) having a human review the image to determine whether the system correctly determined that the parking space is occupied; (4) inputting a correction to the system-determined status; and (5) updating lights at the parking space to reflect the corrected status (*e.g.* red to green).  These steps are all contained in elements (f) to (h) of claim 1 of the '956 patent.  However, these elements are not sufficient to support an infringement claim – the permit enforcement group of claim elements must also be present.

Parking permit enforcement involves the following steps: (1) a permit system (*e.g.* certain locations are restricted to permitted users); (2) a permit indicator (*e.g.* a permit sticker, tag, etc.) for authorized vehicles; (3) a review of the permit indicator associated with a particular vehicle and parking location to determine authorization; and (4) initiating an infringement process against those who park in a restricted area without authorization.  These steps are all contained in elements (i) and (j) of claim 1 of the '956 patent, and each must be present for an infringement claim.

## IV.  LEGAL STANDARD

### A.  RULE 11 GENERALLY

Federal Rule of Civil Procedure 11 requires an attorney to perform an "inquiry reasonable under the circumstances" before filing a complaint.  Rules 11(b) and 11(c) require, in relevant part:

> (b) REPRESENTATIONS TO THE COURT.  By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the

cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery;

…

(c) SANCTIONS.

(1) *In General*.  If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.  Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

"Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well-grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 393 (1990).  The purpose of Rule 11, including its monetary sanctions provisions, is to deter dilatory or abusive pretrial tactics and to streamline litigation by excluding baseless filings.  *Id.*

The presentation of a pleading or other paper to the Court certifies that, to the best of the presenter's knowledge and belief "formed after an inquiry reasonable under the circumstances," the factual contentions thereof "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b)(3).  The certification is designed to create an affirmative duty of investigation both as to law and as to fact, and thus to deter frivolous actions and costly meritless maneuvers.  *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 550 (1991).

Whether the certification is violated is tested objectively.  "Rule 11 sanctions shall be assessed if the paper filed in district court and signed by an attorney or an unrepresented party is frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith."  *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986).

## B.   RULE 11 IN THE PATENT INFRINGEMENT CONTEXT

The Federal Circuit has explained the application of Rule 11 in patent litigation under Ninth Circuit law:

> Rule 11 of the Federal Rules of Civil Procedure imposes a duty on attorneys to certify by their signature that the pleading or motion is well-grounded in fact, has a basis in law, and is not filed for an improper purpose.  *View Eng'g, Inc. v. Robotic Vision Sys.*, 208 F.3d 981, 984 (Fed. Cir. 2000).  Under Ninth Circuit law, "sanctions must be imposed on the signer of a paper if either a) the paper is filed for an improper purpose, or b) the paper if 'frivolous.'"  *Townsend v. Holman Consulting Corp.*, 929 F.3d 1358, 1362 (9th Cir. 1990) (en banc).  With regard to complaints, the Ninth Circuit law finds that "complaints are not filed for an improper purpose if they are non-frivolous."  *Id.* at 1362.  Finally, "[t]he Ninth Circuit defines a 'frivolous' claim or pleading for Rule 11 purposes as one that is 'legally or factually "baseless" from an objective perspective … [and made without] a reasonable and competent inquiry.'"  *Q-Pharma, Inc. v. Andrew Jergens Comp.*, 360 F.3d 1295, 1299 (Fed. Cir. 2004) (citing *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002)).

*Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1337-38 (Fed. Cir. 2007).  Thus, to show a violation of Rule 11 under Ninth Circuit law based on the filing of a complaint, the movant must show both "(1) the complaint is legally or factually 'baseless' from an objective perspective," and (2) the attorney has not conducted "a reasonable and competent inquiry" before signing and filing it.  *Christian*, 286 F.3d at 1127.

As this Court has noted:

> Generally, "[d]etermination of an infringement claim involves a two-step inquiry. 'First the claims are construed, a question of law in which the scope of the asserted claims is defined.'" *Discflo Corp. v. Am. Process Equip., Inc.*, No. 11-CV-00476-BTM (RBB), 2011 U.S. Dist. LEXIS 149424, 2011 WL 6888542, at *2 (S.D. Cal. Dec. 29, 2011) (quoting *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001)). "Second, the claims, as construed, are compared to the accused device … This is a question of fact." *Id.*

*CyWee Grp., Ltd. v. LG Elecs., Inc.*, No. 3:17-cv-01102-BEN-RBB, 2018 U.S. Dist. LEXIS 100826, at *4 (S.D. Cal. June 15, 2018) (Benitez, J.).

"In the context of patent infringement actions, we have determined Rule 11 to require, at a minimum, that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." *Q-Pharma*, 360 F.3d at 1300-01. That inquiry "can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter." *Id.* at 1302. *See also View Eng'g*, 208 F.3d at 986.

"Once a litigant moves based upon non-frivolous allegations for a Rule 11 sanction, the burden of proof ***shifts*** to the non-movant to show it made a reasonable pre-suit inquiry into its claim." *Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007) (emphasis in original; citation omitted). As noted below, this Court can presume that the pre-suit investigation was inadequate unless Park Assist waives its privileges. Ace Parking has shown herein that the evidence relied on by Park Assist is inadequate and affirmatively shows that the claim of infringement against Ace Parking is frivolous. Accordingly, Park Assist must be ready to prove its compliance in response to this motion:

> In bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement. Failure to do so should ordinarily result in the

> district court expressing its broad discretion in favor of Rule 11 sanctions, at least in the absence of a sound excuse or considerable mitigating circumstances.

*View Eng'g*, 208 F.3d at 986 (affirming Rule 11 sanctions applying Ninth Circuit law). "Rule 11 is designed to reduce the reluctance of courts to impose sanctions by emphasizing the responsibilities of attorneys and reinforcing those obligations through the imposition of sanctions." *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 263 (Fed. Cir. 2007) (affirming Rule 11 sanctions) (internal quotations and citations omitted).

This Court must assume that the pre-filing investigation was inadequate unless the attorney waives the privilege/work product and discloses the pre-filing investigation. *Phigenix, Inc. v. Genentech, Inc.*, No. 15-CV-01238-BLF, 2016 U.S. Dist. LEXIS 150752, at *7 (N.D. Cal. Oct. 31, 2016) (accepting that pre-filing investigation was inadequate because privilege was not waived). *See also Segan LLC v. Zynga Inc.,* No. 14-cv-01315-VC, slip op. at 1 (N.D. Cal. June 5, 2015) (order denying request for in camera review – must waive privilege or not use pre-filing investigation); *Segan LLC v. Zynga Inc.*, 131 F. Supp. 3d 956, 963-65 (N.D. Cal. 2015) (granting sanctions after privilege waived on basis that claim construction was frivolous).

## C.    SANCTIONS PURSUANT TO RULE 11

This Court may impose an appropriate sanction when a party's conduct violates Rule 11(b). Fed. R. Civ. P. 11(c)(2). Rule 11 sanctions may be set at a level sufficient to deter repetition of such conduct by others similarly situated. *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1370 (Fed. Cir. 2012). Rule 11 also authorizes a district court to dismiss a case in its entirety when the plaintiff has pursued unfounded claims. *Rhinehart v. Stauffer*, 638 F.2d 1169, 1171 (9th Cir. 1979) ("A district court has the power to dismiss a complaint if it is frivolous or brought for some ulterior purpose"). When the offending pleading is the complaint, the district court is also empowered to award the injured party all of its attorneys' fees incurred in defending the action.

*Gaskell v. Weir*, 10 F.3d 626, 629 (9th Cir. 1993) ("In a case like this, where the original complaint is the improper pleading, all attorney fees reasonably incurred in defending against the claims asserted in the complaint form the proper basis for sanctions.").

## V.     ARGUMENT

### A.     PARK ASSIST VIOLATED ITS RULE 11 OBLIGATIONS REGARDING THE REQUIREMENT FOR HUMAN OVERRIDE.

Element (g) of claim 1 of the '956 patent requires "deciding whether said occupied status is incorrect, based on a visual review of said thumbnail image on said GUI." D.I. 23-1 at 22:53-55. The FAC states, regarding this claim element, "Upon information and belief the Airport Parking System being operated by Defendants is not foolproof in accurately detecting occupancy of spaces and Defendants and/or their employees or agents operating the Airport Parking System are" practicing this claim element. D.I. 23 ¶ 45(h). The FAC then cites to portions of the PGSR, an INDECT brochure, and an INDECT website. *Id.*

Park Assist does not cite to any basis that would support the inference that the PGSR has any bearing on the operation of the Airport Parking Plaza. In fact, Park Assist cannot make such a citation, because the PGSR simply does not. Mr. DeGraffenreid's Declaration states:

> I understand that Park Assist has alleged that Ace Parking infringes its patent U.S. Patent No. 9,594,956 ("the '956 patent") based, in part, on Park Assist's interpretation of a document entitled "Division 11 – Equipment, Section 11 12 01, Parking Guidance System" ("PGSR") attached as Exhibit C to Park Assist LLC's First Amended Complaint for Patent Infringement.

> I have never seen the PGSR. It has never been referred to with respect to any of the operation of the San Diego Parking Airport parking facility.

> Prior to the lawsuit being filed I did not even know that the PGSR document existed.

> The PGSR document is not used or referenced by Ace in operating any of the automated system in the Terminal 2

parking facility, including the Indect system.

DeGraffenreid Decl., ¶¶ 4-7.

Nevertheless, Park Assist cites the following from the PGSR:

E.    Accuracy:

1.    The system shall be accurate to 99% for vehicle counting.

2.    For license plate recognition the system shall have a capture rate of 99% and the system shall be accurate to a 95% level for plates that are non-exceptions.  That is plates that can be read and are not blocked from view or in other ways not readable.  The vendor shall propose a method to determine the measurement of the accuracy of the system to be accepted by the Airport.  The testing procedures shall be incorporated as part of the overall PARCS testing procedures.

Ex. C (PGSR) at 10;

D.I. 23 ¶ 45(h).

This reference to the PGSR – the only support Park Assist offers – demonstrates the need for sanctions.  It does not state or suggest – anywhere – that the system occupancy determinations must be subject to human review and correction to achieve 100% accuracy.  The requirement that the system be at least 99% accurate on its face shows that a 1% error rate will be tolerated.  Quite simply, the PGSR just discusses accuracy, not occupancy determinations by human review.  This is further indicated by the fact that this statement appears in the section on sensors, and sensors are the exact opposite of human operation.  D.I. 23-3 at 9-10.  Notably, Park Assist did not cite to the section of the PGSR on operator training, which says nothing about reviewing and overriding automatic occupancy determinations.  That section states:

3.4    TRAINING

A.    General:  Engage a factory-authorized service representative to organize, schedule and train Owner's maintenance personnel in adjusting, operation and maintenance of the parking control system.   Provide training to achieve the following general objectives:

1.    Proper operation and adjustment of system.

2.    Required programming of the system controller and related devices.

3.    Trouble shooting using maintenance and repair manuals.

4.    Use of any special tools required for adjustment or repair.

D.I. 23-3 at 15.

Conspicuously absent is any suggestion that Ace Parking personnel will be trained on reviewing images of parking spaces to determine accuracy.  Nor does any suggestion exist that they will be trained how to correct any such determination.  Park Assist knew that the relevant portions of the PGSR did not support its claim and intentionally and falsely stated that the PGSR said something it plainly does not.

Park Assist also relied on the PGSR and screen shots from INDECT to support the allegation that Ace Parking, in managing the Airport Parking Plaza, practices element (f) of the '956 patent by "displaying a thumbnail image of said parking space on a graphical user interface (GUI), said thumbnail image digitally processed from an image electronically communicated to said GUI from said imaging unit."  D.I. 23 ¶ 45(g).  Park Assist cites to the following in support:

### 2.3   PARKING COUNT MANAGEMENT SYSTEM

   A.    General: Provide manufacturer's standard software that has open architecture for integration with third party software and provides automatic facility monitoring, supervision, and remote control of parking guidance equipment from one or more locations.  The system shall work through a web based interface where all information is readable through any terminal that is connected to the internet and provides a proper password.

Ex. C (PGSR) at 12;



Ex. G (INDECT Data Sheet) at 2;

*Id.*

These citations do not show or infer that Ace Parking has implemented any display of thumbnails from the INDECT system.  Park Assist has provided no evidence suggesting any reason for Ace Parking to do so.  Further, Ace Parking affirmatively states that no display or review of thumbnails is being done.   Mr. DeGraffenreid's Declaration states:

> Ace does not have the ability to display thumbnails of any image taken by the Indect system.  Ace has no need for that information and no way to use it.  Ace does not have any monitor connected to the Indect system nor any other way to review images obtained by the Indect system.

> This is true now and has been true since the Indect system was first placed into service.

> Ace does not have any personnel trained or assigned to review the occupancy determinations made automatically by the Indect system.  Ace has never had such personnel.  Ace has no plans to implement human review and override of occupancy determinations by the Indect system.

> Ace has not received any instruction or request from the San Diego Airport Parking Authority for the Indect camera-based parking guidance system to have the capability to display thumbnails for human review and correction of parking space occupancy determinations made by the system.

> I do not know the actual numerical accuracy of the Indect system.  However, since the system has been installed, Ace has not received any comments or complaints that the system is inaccurate.  At least as a practical matter, in operation it appears to be highly accurate.

DeGraffenreid Decl., ¶¶ 8-12.

Element (h) of claim 1 of the '956 patent requires "correcting said occupied status, by inputting computer-readable instructions to a computer terminal of said GUI, if said parking space shown in said thumbnail image is vacant and said computer terminal electronically communicating a command to toggle said multicolor indicator to illuminate a second color, said second color predefined to indicate a vacant status."  D.I. 23-1 at 22:56-63.  The FAC states, regarding this claim element, "Upon information and

belief Defendants and/or their employees or agents operating the Airport Parking System are" practicing this claim element. D.I. 23 ¶ 45(i). The FAC then cites to portions of the PGSR, an INDECT data sheet, and an INDECT website. *Id.*

Specifically, Park Assist cites the above portion of the PGSR regarding "accuracy" as well as the following:

> 3.   The system shall be designed so the Operator can make adjustments to system counts and all field devices from the central system.

Ex. C (PGSR) at 13;

> 2.   The system shall be designed so the Operator can override any sign from the central system.

Ex. C (PGSR) at 12;

*Id.*

Citations to these references are blatantly misleading, as they actually concern customer viewable signs that display space counts on applicable rows, and not backend human review and override of individual occupancy determinations. Simply put, the requirement that the system be "designed so the Operator can make adjustments to system counts and all field devices" and "designed so the Operator can override any sign from the central system" has nothing to with human override of occupancy determinations, and Park Assist knew or should have known that prior to filing. Nowhere does the PGSR state or suggest that the system determinations of occupancy must be subject to human review and correction. Moreover, system counts, field devices, and signs all differ from occupancy determinations, which are internal software operations. This is further confirmed by the fact that this statement appears in the section of the PGSR on system performance – not human operation. D.I. 23-3 at 12-13.

Most concerning is that Park Assist was advised that its allegations are factually wrong and still persisted to pursue this lawsuit. On October 19, 2018, INDECT filed a Complaint in this Court seeking declaratory relief that its camera-based parking

guidance systems do not infringe Park Assist's '956 patent.  Gray Decl. Ex. C.
INDECT's Complaint makes clear that its camera-based parking guidance systems do
not allow for human override.  *Id.* ¶¶ 2, 33, 45, 47, 61-63.  On November 2, 2018, Park
Assist sent a letter disputing the allegations in INDECT's Complaint and requesting
evidence that the Airport Parking Plaza does not use human override.  Gray Decl. Ex. F.
Park Assist was then informed numerous times that the Airport Parking Plaza does not
have this capability.  Gray Decl. Ex. G ("no such functionality exists in the Terminal 2
System, as my previous letter told you and Indect USA's lawsuit against your client
confirms"); Ex. H ("You have not cited any evidence from the San Diego specifications
or any Indect literature that requires or even suggests that the Indect system permits
correction of occupancy determinations.  Your citation to general statements about
manual controls doesn't get close to evidence of a capability to override an occupancy
determination made by the system.  Further, nothing in the accuracy target of 99%
indicates that there will be any effort to correct any errors at all, much less in real-time
… You also don't have any evidentiary basis to allege that even one correction has ever
occurred.  It has not because it cannot.  Your allegation that inaccuracies, if any, 'must
be corrected' is absolutely devoid of evidentiary support.").

On December 5, 2018, INDECT provided Park Assist precisely what it requested,
a sworn declaration from INDECT's President making clear that the Airport Parking
Plaza does not allow for human override:

> There is no capability within the UPSOLUT System [i.e. the
> system used by the Airport Parking Plaza] for anyone—a user,
> an INDECT employee, or any other person—to change the
> current status of a given parking space as determined by the
> UPSOLUT System's algorithm—either locally or at the
> network level.  A parking space whose current status is
> "occupied" cannot have its status manually changed to "vacant"
> nor vice versa.

Gray Decl. Ex. J ¶ 12.  Despite specific evidence of non-infringement, Park Assist
refused to dismiss its Complaint against Ace Parking.

Mr. DeGraffenreid confirms that the INDECT system operated by Ace Parking does not have the ability to manually change the occupancy status of a parking space. DeGraffenreid Decl., ¶ 13.

Park Assist stated on November 2, 2018, that "[i]f it is true that there is not now, and never has been, any possibility of a human changing a parking space indicator in the Airport system, contrary to all the documentation, then we will not be asserting infringement.  Neither our firm, nor our client, has any desire to pursue a patent infringement case if there is not now and never has been any infringement."  Gray Decl. Ex. F.  Park Assist's actions demonstrate the opposite.  Yet, Park Assist continues pursuing this litigation – despite having evidence showing that the Airport Parking Plaza has no human override prior to filing both its Complaint and FAC and despite receiving a sworn declaration from INDECT's President confirming that this functionality simply does not exist in INDECT's product used by the San Diego Airport (Gray Decl. Ex. J).

If the Airport Parking Plaza has no human override, then the claim is objectively frivolous and this Court should levy sanctions.  Resolution of this question turns on the simple undeniable fact that the Airport Parking Plaza has no human override.  Both the Complaint and the FAC are factually baseless from an objective perspective when they assert patent infringement for a system that lacks human review and override.  It is clear that Park Assist's counsel did not conduct a reasonable and competent inquiry before signing and filing them.  *Christian*, 286 F.3d at 1127.

## B.    PARK ASSIST VIOLATED ITS RULE 11 OBLIGATIONS REGARDING THE REQUIREMENT FOR PARKING PERMIT ENFORCEMENT.

Element (i) of Claim 1 of the '956 patent requires "extracting from said high resolution image, by digital image processing, a permit identifier for said vehicle and comparing said permit identifier with at least one parking permit identification stored on said storage to determine a permit status of said parked vehicle."  D.I. 23-1 at 22:63-67. The FAC states, regarding this claim element, "Upon information and belief the Airport

Parking System being operated by Defendants is" practicing this claim element.  D.I. 23 ¶ 45(j).  The FAC then cites to portions of the PGSR and an INDECT data sheet relating to license plate recognition used for differential parking rates.  *Id.*

Specifically, Park Assist cites the following:



Ex. G (INDECT Data Sheet) at 4; and

Ex. C (PGSR) at 3).

*Id.*

These irrelevant references are the only support Park Assist offers and they demonstrate the need for sanctions.  Neither license plate recognition nor differential pricing, if present, would meet elements (i) and (j) of the '956 patent.  In identifying several "additional features" that can be implemented using its camera system, the '956 patent specification makes clear that variable pricing and permit parking are different concepts.  D.I. 23-1 at 13:4-22:28.  The patent describes "Tiered Parking Control" this way: "Under the tiered parking control scheme, the cost of parking varies depending on the location of each individual parking space … This enables differential pricing to be efficiently varied based on location, type or demand down to the individual space of the car park." (*id.* at 13:64-14:18, operational details omitted).

This "differential pricing" ability differs from "Permit Parking Control" set forth as the next "additional feature" in the '956 patent.  The permit parking control is described as: "Detection algorithms in the system software are capable of identifying permit badges to ensure that parking spaces that are allocated for permit use are occupied by authorised [sic] permit holder only." (*id.* at 14:22-25).  A stark distinction exists between charging different rates for different spaces and controlling access to spaces allocated for permit use.  Park Assist itself has acknowledged that Claim 1 does not relate to differential parking rates yet brought the claim anyway.  Referring to differential rates, Park Assist's lead counsel stated, "[t]his language, however, does not appear in the claims of the asserted patent …"  Gray Decl. Ex. D.  While admitting that differential parking rates are not covered by the '956 patent, Park Assist cites only portions of the PGSR which discuss charging differential rates and say nothing about parking permits.  ***Park Assist knows that the INDECT system at the Airport Parking Plaza does not monitor spaces for permit use, yet filed the Complaint and FAC anyway.***

Park Assist's reference to the ability of the INDECT system to read license plates is a red herring.  License plate recognition is not parking permit enforcement.  Park Assist cannot deny this because Park Assist distinguished the permit parking aspect of its invention from license plate recognition when persuading the USPTO to issue the '956 patent.  During prosecution of the '956 patent, the USPTO rejected various proposed claims containing the required license plate recognition coupled with differential parking rates on the basis that that feature was disclosed in Lee, U.S. Publication No. 2008/0258935.  The USPTO combined the teachings of Lee with the teachings of King, U.S. Publication No. 2009/0192950, in the rejections.  Gray Decl. Ex. E.  Park Assist argued that the claim with permit parking enforcement was patentable because "Lee and King, alone or in combination, fail to show, teach or suggest any process or structure for, 'extracting … a permit identifier … and comparing … with … parking permit identification … to determine a permit status …' and 'initiating an

infringement process for said vehicle having said permit identifier that fails [to] coincide with at least one of said at least one parking permit identification' as recited in [application] claim 19." Gray Decl. Ex. A. Park Assist cannot argue to the USPTO that a reference to license plate recognition combined with differential parking rates does not "show, teach or suggest" permit parking control and then argue that a less specific reference in the PGSR supports an inference that these claim elements are present in the operation of the Airport Parking Plaza.

Similarly, whether the PGSR contains discussion about preferred parking and charging different parking rates is also irrelevant. But in any event, nothing in the PGSR or a public inspection of the parking garage shows that the Airport Parking Plaza has permit parking enforcement functionality. No permit areas even exist to enforce.

Element (j) of claim 1 of the '956 patent further requires "initiating an infringement process for said vehicle having said permit identifier that fails to coincide with at least one of said at least one parking permit identification." D.I. 23-1 at 22:56-63. The FAC states, regarding this claim element, "Upon information and belief the Airport Parking System being operated by Defendants is" practicing this claim element. D.I. 23 ¶ 45(k). The FAC then cites to portions of the PGSR. *Id.*

Specifically, Park Assist cites the following:

> a. License plate information for enforcement. Use license plate information to adjust parking charges when out of compliance. The PARC system shall take data input from the PG system license plate recognition for comparison to the

> preferred parking database and if an unauthorized vehicle parks in a preferred parking space the PARC system must charge this vehicle the preferred parking rate at the time of payment.

Ex. C (PGSR) at 5-6.

*Id.*

Park Assist's singular reliance on this reference also mandates sanctions. The fact that the PGSR includes the word "unauthorized" does not save Park Assist. The sentence in which "unauthorized" appears unequivocally refers to differential parking

fees, not permit parking backed up with enforcement actions.  As discussed above, charging different rates for different parking spaces is described in a section of the '956 patent that is distinct from the permit parking enforcement actually in the claims.  The patent itself prevents confusing the two capabilities, and Park Assist's counsel must know that.  Further, these references do not state or suggest that the Airport Parking Plaza, *in operation*, has parking permit enforcement functionality.

Park Assist has no basis to assert, even "upon information and belief", that the Airport Parking Plaza practices these claim elements.  Defendants have made clear to Park Assist numerous times that the PGSR relied on by Park Assist does not show how the Airport Parking Plaza operates in practice, and that the Airport Parking Plaza simply has no permit parking spaces.  Gray Decl. Ex. G ("anyone driving into the Terminal 2 System and parking a car can see that there are no permit parking spots"); Ex. H ("Park Assist improperly relied solely on a strained interpretation of documentation concerning underline potential capabilities of the Airport Parking System, not any evidence regarding its actual operation … Park Assist could easily have determined the absence of any of these features by simply visiting the San Diego parking facility."); Ex. K ("This is in addition to the publically-available fact (which again your local counsel could determine if he bothered to drive to the Airport and park in the Terminal 2 lot—which I suspect he may very well have done since this action was filed) that there is neither permit nor preferred parking in the Terminal 2 lot.").

It is evident from review of the FAC that someone on behalf of Park Assist visited the Airport Parking Plaza, as Park Assist includes photographs of the Airport Parking Plaza in the FAC.  D.I. 23 ¶¶ 45(a), 45(b), 45(d); D.I. 23-6.  Noticeably absent from the FAC are any photographs of the Airport Parking Plaza showing permitted parking areas subject to enforcement.  Obviously, if Park Assist had evidence that the Airport Parking Plaza contained such areas, Park Assist would have included such photographic evidence in the FAC.

To avoid any doubt, Mr. DeGraffenreid confirms that the Airport Parking Plaza does not have any permit parking system (other than handicapped parking) and no permit parking system, including handicapped parking, that is monitored or enforced with any component of the INDECT system. DeGraffenreid Decl., ¶¶ 14-18.

Finally, whether the INDECT camera-based parking guidance system used at the San Diego Airport has the capability of reading license numbers and storing them for potential use (as alleged in the FAC) is irrelevant. Potential capabilities do not support allegations of infringement of a method claim. "A patented method is a series of steps, each of which must be performed for infringement to occur. It is not enough that a claimed step be 'capable' of being performed." *Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 Fed. Appx. 603, 606 (Fed. Cir. 2007); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) (rejecting an argument that a claim requiring the replacement of appliances can be performed if the appliances are merely "capable of" being replaced); *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005) ("[T]he use of a [claimed] process necessarily involves doing or performing each of the steps cited.').

Despite not having evidence prior to filing either its Complaint or FAC that the Airport Parking Plaza, in operation, has parking permit enforcement functionality, despite being told numerous times that the documents Park Assist relies on in its FAC do not demonstrate the operation of the Airport Parking Plaza in practice, and despite having visited the Airport Parking Plaza and not finding any evidence of parking permit enforcement functionality, Park Assist continues pursuing this litigation. Both the Complaint and the FAC are factually baseless from an objective perspective. Park Assist should therefore be sanctioned by this Court.

## C.   PARK ASSIST VIOLATED ITS RULE 11 OBLIGATIONS REGARDING CLAIM 1 OF THE '956 PATENT.

As noted above, element (h) of claim 1 of the '956 patent requires, *inter alia*, "correcting said occupied status … if said parking space … is vacant[.]"   In contrast, the

very next step, element (i), requires: "extracting from said high resolution image, by digital image processing, a permit identifier." Park Assist (wrongfully for other reasons) alleges that processing an image to identify a license plate meets this portion of element (i).   However, and unavoidably, an image of a vacant parking space – required for element (h) – cannot be processed for a license plate number in element (i).   Indeed, given that element (h) requires a parking space to actually be vacant (even if, at first, the system determined the space was occupied), it is not possible to determine who an "enforcement action" would be prosecuted against as required in element (j).   This fatal conflict appears on the face of the '956 patent and had to be known by Park Assist's counsel before the case was filed.

Claim 1 of the '956 patent, as written, is impossible to infringe and is therefore invalid.   *Trs. of Boston Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1362 (Fed. Cir. 2018) (finding patent claim invalid for lack of enablement and stating "[w]e can safely conclude that the specification does not enable what the experts agree is physically impossible."); *Frazier v. Wireline Sols., LLC*, 725 F. Supp. 2d 588, 595 (S.D. Tex. 2010) (finding a patent claim requiring a lower end of one bridge plug to connect with another bridge plug located above the first to be impossible and therefore not infringed).   As explained above, simply no way exists for a camera-based parking guidance system to perform element (h) (i.e. correcting a status from "occupied" to "vacant") for an alleged vehicle in a particular parking space while also performing elements (i) and (j) for that same alleged vehicle and parking space.

Park Assist knew, or at the very least should have known, that it is physically impossible to infringe claim 1 of the '956 patent for the reasons stated above.   This additional violation of Rule 11 obligations merits sanctions.

### D.     PARK ASSIST IS PURSUING THIS LITIGATION IN BAD FAITH.

Given the absolute absence of an objective case, this Court need not make a finding of bad faith to impose sanctions.   Nevertheless, ample evidence exists to support that conclusion.     After INDECT filed its declaratory judgment action of non-

infringement, Park Assist sought to dismiss INDECT's declaratory judgment action, rather than agreeing to dismiss this action against the San Diego Airport and Ace Parking (and stipulate that no system using INDECT cameras could infringe).  In that motion, Park Assist provided evidence of its own bad faith.  Specifically, Park Assist attached multiple communications to potential customers repeating its frivolous claim that customers of INDECT will face liability for infringing the '956 patent and citing to this case as a warning.  Gray Decl. Ex. L.  Park Assist is using this action and the power of this Court to advance its business in bad faith.  This Court can, and should, find that Park Assist has acted in bad faith and grant sanctions accordingly.

## VI.    **CONCLUSION**

Park Assist has failed to meet its Rule 11 obligations by failing to sufficiently investigate the technical merits of its infringement allegations before filing suit.  Park Assist has nevertheless imposed on Ace Parking the significant expense of appearing before this Court, and responding to this litigation.  "Rule 11 prohibits imposing these costs upon a defendant absent a basis, well-grounded in fact, for bringing the suit." *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997).  As a Rule 11 sanction, the FAC against Ace Parking should be dismissed, and Park Assist and its counsel should be ordered to reimburse Ace Parking its attorneys' fees and costs incurred with respect to the improvidently filed Complaint and FAC.  *Id.* at 784-85 ("an attorney and client may be held jointly severally liable" for asserting patent infringement without "a basis, well grounded in fact" that the patent claims can be interpreted to cover the accused product).  Additionally, Ace Parking requests that this Court make a finding that this case is frivolous, order that Park Assist must send a copy of this Court's order finding the case frivolous to each entity that Park Assist has sent a notice letter to regarding its '956 patent, and order Park Assist to issue a press release that its case against Ace Parking was deemed frivolous by this Court.

Dated:  March 19, 2019                    Respectfully submitted,

**FOLEY & LARDNER LLP**


*/s/ Paul V. Storm*
JUSTIN E. GRAY, CA Bar No. 282452
  jegray@foley.com
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CALIFORNIA  92130
TELEPHONE:      858.847.6700
FACSIMILE:      858.792.6773

PAUL V. STORM (*Pro Hac Vice*)
  pvstorm@foley.com
TERRELL R. MILLER (*Pro Hac Vice*)
  tmiller@foley.com
J. MICHAEL THOMAS (*Pro Hac Vice*)
  jmthomas@foley.com
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 MCKINNEY AVENUE, SUITE 1600
DALLAS, TX 75201-3340
TELEPHONE:      214.999.3000
FACSIMILE:      214.999.4667

Attorneys for Defendant
ACE PARKING MANAGEMENT, INC.

4822-4537-6902